**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| TIMOTHY ELLIOTT, | ) | |
| | ) | CASE NO. 1:13CV1687 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff Timothy Elliott ("Elliott") challenges the final decision of the Acting

Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying his claim for a

Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the

Social Security Act ("Act"), 42 U.S.C. §§ 416(I), 423 *et seq*.  This matter is before the Court

pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28

U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is AFFIRMED.

**I.  Procedural History**

On May 27, 2010, Elliott filed an application for POD and DIB alleging a disability onset

date of August 1, 2009 and claiming he was disabled due to heart disease and arthritis.[1]  (Tr. 76, 150, 172.)  His application was denied both initially and upon reconsideration.  (Tr. 76-85, 86-95.)  Elliott timely requested an administrative hearing.  (Tr. 107.)

On March 30, 2012, an Administrative Law Judge ("ALJ") held a hearing during which Elliott, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 28-67.)  On May 22, 2012, the ALJ found Elliott was able to perform past relevant work and alternatively, able to perform a significant number of jobs in the national economy and, therefore, not disabled.  (Tr 18-19.)  The ALJ's decision became final when the Appeals Council denied further review.  (Tr. 1-4.)

## II.  Evidence

### Personal and Vocational Evidence

Age fifty-two (52) at the time of his administrative hearing, Elliott is a "person approaching advanced age" under social security regulations.[2]  *See* 20 C.F.R. § 404.1563(d) & 416.963(d).  Elliott has a high school education and past relevant work as a cleaner, retail store manager, and stock clerk.  (Tr. 18, 59-60.)

### Relevant Medical Evidence

In November 2008, Elliott presented to Frank G. Sailors, D.O., with complaints of right foot and heel pain.  (Tr. 231.)  Dr. Sailors diagnosed left ankle pain and left calcaneal spur.  (Tr.

---

[1]  It appears Elliott also applied for Supplemental Security Income ("SSI") disability benefits on May 27, 2010.  (Tr. 97-102.)  This application was denied on July 29, 2010 on the grounds Elliott did not meet income eligibility requirements.  (Tr. 97.)

[2]  Elliott was forty-nine (49) years old on his alleged disability onset date, which is defined as a younger individual pursuant to 20 CFR § 404.1563(c).  He subsequently changed age categories to a "person approaching advanced age" by the time of his administrative hearing.

-2-

230.)  An imaging study dated November 13, 2008 found small plantar calcaneal spurs and "mild hallux valgus deformity . . . with mild 1st MTP joint space loss, osteophyte formation and mild subchondral cystic changes of the 1st metatarsal head, medial aspect."  (Tr. 324.)  The parties do not direct this Court's attention to any medical evidence indicating Elliott received treatment for his foot pain during the remainder of 2008 or 2009.

On August 24, 2009, Elliott was admitted to the hospital with complaints of chest pain. (Tr. 590-600.)  He reported that he and his wife had taken a 5 to 6 mile bike ride, during which he noticed a pressure or "heartburn type of sensation" in his chest.  (Tr. 597.)  Elliott underwent an EKG, which showed atrial flutter with a rapid ventricular response rate.  (Tr. 597.)  A cardiac catheterization was also performed, which revealed global hypokinesis of the left ventricle suggestive of dilated cardiomyopathy.  (Tr. 590.)  Elliott remained hospitalized for several days and was started on various medications, including anti-coagulants.  (Tr. 590-591.)  On August 29, 2009, Elliott was discharged home with diagnoses of atrial fibrillation and chronic dilated cardiomyopathy with ejection fraction of about 25%, but no evidence of coronary artery disease was found.  (Tr. 590.)

On September 16, 2009, Elliott began treatment with Martin Wiseman, M.D.  (Tr. 707, 709-711)  Dr. Wiseman performed a biventricular implantable cardioverter defibrillator ("ICD") procedure on September 30, 2009.  (Tr. 707, 618-620.)  Elliott returned to Dr. Wiseman on November 11, 2009, at which time he reported feeling "pretty well."  (Tr. 707.)  He indicated he had gone on a vacation since implantation of the ICD and had been able to bike for 10 miles. *Id.* Upon examination, Dr. Wiseman observed that Elliott appeared well; had normal heart sounds; no peripheral edema; and, intact pulses. *Id.*  Elliott presented to Dr. Wiseman again on December

-3-

10, 2009, at which time Dr. Wiseman determined he looked well but still remained in atrial fibrillation.  (Tr. 705.)  Shortly thereafter, Dr. Wiseman undertook a DC cardioversion via Elliott's ICD device, which shocked him into sinus rhythm for about four days. (Tr. 630, 703.) The following month Elliott denied dyspnea on exertion and reported regular exercise, both on a treadmill and with light weights.  (Tr. 703.)

On March 21, 2010, Elliott presented to Charmaine Gutjahr, M.D., with complaints of bilateral toe numbness.  (Tr. 273.)  He reported he was not experiencing any pain that day, and indicated the numbness "comes and goes." *Id.*  Dr. Gutjahr determined Elliott was in no apparent distress; had no lower extremity edema; and had "good exercise tolerance." *Id.*  Three days later, on March 24, 2010, Elliott returned to Dr. Gutjahr, complaining that his "feet feel achy." (Tr. 276.)  Dr. Gutjahr diagnosed possible mild bilateral foot neuropathy.  *Id.*

In April 2010, Elliott returned to Dr. Wiseman.  (Tr. 701.)  He reported increased fatigue, although Dr. Wiseman noted that "[i]nterestingly, when he gets on the treadmill, he is able to jog without much difficulty." *Id.*  Elliott underwent another electrocardiogram, which showed atrial fibrillation with a well-controlled ventricular rate. *Id.*

On April 27, 2010, Elliott presented to Dr. Sailors with complaints of discomfort in the paracervical region bilaterally, slightly worse on the right with side bending and rotation.  (Tr. 865.)  An x-ray showed loss of normal cervical lordosis with moderate to severe disc space loss, and mild anterior and posterior osteophyte formation at C6-7 primarily.  (Tr. 325.)  Dr. Sailors diagnosed cervical osteoarthritis and discomfort; and, prescribed pain medication. (Tr. 865-866.)

Elliott returned to Dr. Sailors on May 7, 2010 complaining of "fairly significant discomfort in the paracervical region, bilateral, worsened slightly on the right."  (Tr. 862.)  Dr.

Sailors diagnosed neck pain and osteoarthritis of the cervical spine, and continued Elliott on pain medication.  (Tr. 862-863.)  On June 4, 2010, Elliott underwent a myelogram of the cervical spine, which revealed (1) moderate-sized disc osteophytes at C5-C6 and C6-C7 with effacement of the anterior subarachnoid space without any cord compression; (2) very slight narrowing of the neural foramina at C5-C6 on the right and at C6-C7 bilaterally; and, (3) degenerative arthritis in the facet joints.  (Tr. 326-327.)  Elliott was referred to pain management.  (Tr. 731.)

On June 21, 2010, Elliott presented to Emad Mikhail, M.D., of Great Lakes Pain Management with complaints of pain in his neck, bilateral shoulders, and lower back.  (Tr. 731-735.)  He rated his neck pain a 5; his shoulder pain a 7; and his lower back pain a 2-3 on a scale of 10.  (Tr. 731-732.)  Dr. Mikhail diagnosed cervicalgia/neck pain and cervical spondylosis without myelopathy.  (Tr. 734.)  Bilateral facet joint steroid injections at C3-4, C4-5, and C5-6, were recommended and administered on June 25, July 9, and July 23, 2010.  (Tr. 734, 736-738.)  In August 2010, Elliott reported improvement in his neck pain since the injections, but still complained of stiffness.  (Tr. 740.)  He was continued on pain medication and referred for physical therapy, which he completed in August and September 2010.[3]  (Tr. 742, 750-756, 781-786.)

Meanwhile, on July 13, 2010, Elliott presented to Dr. Wiseman and reported feeling "generally quite well."  (Tr. 699.)  On examination, Dr. Wiseman found Elliott looked well but

---

[3]  When he began physical therapy in August 2010, Elliott was noted to have decreased cervical range of motion in all categories.  (Tr. 753-754.)  After ten sessions in August and September 2010, Elliott reported "no pain for over one week," no pain with movement, a return to normal activities of daily living, and an increased range of motion.  (Tr. 783.)  Elliott's physical therapist noted that his pain had resolved/improved and that he had achieved his goal of improving his C5 range of motion.  (Tr. 783.)

did note that his electrocardiogram continued to show atrial fibrillation. (Tr. 699.) During a visit in September 2010, Dr. Wiseman noted Elliott "has really been doing quite well since" implantation of the ICD. (Tr. 918.) He indicated Elliott had recently received a "shock" from his ICD as a result of rapid atrial fibrillation; that it returned him back to normal sinus rhythm; and, "he appears to have been there ever since." *Id.* Dr. Wiseman stated Elliott looked "very well." *Id.*

In October 2010, Elliott presented to Dr. Sailors with complaints of discomfort in the paracervical region with palpation; and discomfort in the left hip greater than right with flexion of knee on chest and abduction of the femur. (Tr. 901.) An x-ray of Elliott's bilateral hips showed "normal appearance, no acute fracture." (Tr. 486.) Dr. Sailors advised him to "slowly increase range of motion and activity." (Tr. 901.) The following month, Elliott again reported discomfort in the paracervical region with side bending and rotation, as well as some discomfort in the occipital area. (Tr. 898.) Dr. Sailors "discussed with [Elliott] the likelihood that he is not going to be able to work in any meaningful capacity and he should look at social security and/or disability." *Id.*

In December 2010, Elliott told Dr. Wiseman he was experiencing increased fatigue and lack of stamina. (Tr. 916.) However, by February 2011, he reported being able to walk two miles on the treadmill with a maximum speed of 4.6 miles per hour. (Tr. 912.) Dr. Wiseman described him as "very fit;" stated his cardiomyopathy was well-compensated; and, found him to be in a "very stable situation." (Tr. 912-913.) In May 2011, although acknowledging occasional shortness of breath on exertion, Dr. Wiseman concluded Elliott "has done extremely well in general and leads a pretty normal life in spite of his known cardiomyopathy." (Tr. 1034.)

On June 14, 2011, Elliott presented to Dr. Sailors with complaints of pain in both knees, left hip, and left heel.  (Tr. 1045.)  X-rays of Elliott's bilateral knees showed "minimal arthritic changes."  (Tr. 1049.)  Dr. Sailors advised Elliott to "slowly increase activity preferably with biking and swimming."  (Tr. 1045.)  Two months later, in August 2011, Elliott presented to Margarita Brin, M.D., with complaints of right foot pain and swelling.  (Tr. 1042.)  He reported he was in New York over the weekend and "was doing a lot of walking."  *Id.*  Elliott denied numbness or tingling, but stated his foot pain was worsening and "becoming more constant." (Tr. 1044.)  An x-ray of Elliott's right foot showed mild first metatarsal phalangeal arthritis with mild hallux valgus deformity.  (Tr. 1048.)

On August 17, 2011, Elliott presented to Catherine E. Ferguson, D.P.M., for further evaluation of his foot pain.  (Tr. 1059-1060.)  On examination, Dr. Ferguson noted "full (range of motion) without pain or crepitus at the ankle joint, subtalar joint, midtarsal joint and 1st metatarsophalangeal B/L joint with the exception of pain and guarding of the (right) MTJ + pain with palpation of 5th metatarsal styloid process R and extending proximally along the peroneal tendons into posterior leg."  (Tr. 1060.)  She noted a small mass palpated at the base of the 5th metatarsal right "possibly consistent with hematoma perhaps from partial tendon rupture" and ordered a CT scan.  *Id.*  Dr. Ferguson also prescribed a pneumatic CAM walker. *Id.*

On August 18, 2011, Elliott underwent a CT scan of his  right foot, which revealed "subcutaneous edema and swelling along the dorsal lateral mid foot compatible with soft tissue hematoma."  (Tr. 1053.)  A Venous Doppler Study showed no evidence of deep vein thrombosis. (Tr. 1052.)  Elliott returned to Dr. Ferguson on August 26, 2011, complaining of "unremitting

pain" in his right foot.  (Tr. 1058.)  Dr. Ferguson ordered Elliott to minimize all weight bearing activities and remain in the CAM walker for 4 to 6 weeks.  *Id.*

On October 6, 2011, Elliott presented to Dr. Ferguson and reported "he is no longer experiencing pain but he is having problems with the CAM walker;" i.e., dry, itchy skin and a sore on the back of his leg.  (Tr. 1057.)   Dr. Ferguson noted full range of motion without pain or crepitus at the ankle joint, subtalar joint, midtarsal joint, and 1st metatarsalphalangeal joint B/L. *Id.*  She also reported full muscle strength and "no pain" elicited with palpation along 5th metatarsal shaft and base, right foot.  *Id.*  Dr. Ferguson assessed Elliott's hematoma as "resolved" and advised him to discontinue use of the CAM walker and "carefully increase his activity." *Id.*

On November 4, 2011, Elliott presented to Dr. Ferguson with "a chief complaint of pain in the back of his left heel."  (Tr. 1056.)  He stated "the hematoma previously diagnosed on his R heel continues to hurt though less so and denies need for the CAM walker at this point."  *Id.* Once again, Dr. Ferguson noted full range of motion without pain or crepitus and full muscle strength.  *Id.*  She did, however, note increased pain with palpation of the left Achilles tendon. *Id.*  She diagnosed "hematoma R- resolving" and "Achilles tendonitis L" and instructed Elliott to resume use of the CAM walker on his left leg.  *Id.*

On December 7, 2011, Elliott returned to Dr. Ferguson, complaining of "painful heels." (Tr. 1070.)  Elliott stated he wore the CAM walker for four weeks "but threw it into the garage last week as he 'hated the thing.'" *Id.*  Dr. Ferguson noted full range of motion without pain or crepitus and full muscle strength in all muscle groups; but observed "significant guarding with + pain upon palpation of heels plantarly and slightly with posterior palpation L." *Id.*  X-rays of

-8-

Elliott's left foot showed no acute bony pathology, "no significant spurring. . . despite pt report that he has heel spurs;" and, well maintained soft tissue integrity.  *Id.*  Dr. Ferguson diagnosed recalcitrant plantar fasciitis B/L; "pain in limb B/L;" and, Achilles tendonitis L.  *Id.*  She recommended stretching, icing, and NSAID therapy; and, cautioned Elliott to "watch L Achilles tendinitis to prevent rupture."  (Tr. 1071.)

On February 16, 2012, Elliott presented to Dr. Wiseman with complaints of constant fatigue and occasional dyspnea on exertion.  (Tr. 1084.)  Dr. Wiseman advised Elliott to cease taking one of his medications, amiodarone, as it might be causing his fatigue.  (Tr. 1084-1085.)  That same day, Elliott presented to Joseph Zayat, M.D., complaining of neck pain.  (Tr. 1117-21.)  He reported being able to walk a half mile at a time.  (Tr. 1117.)  Dr. Zayat ordered a CT scan of his brain, and started him on Tizanidine. (Tr. 1119.)  Shortly thereafter, on March 1, 2012, Elliott was hospitalized after suffering a "frank syncopal episode."[4]  (Tr. 1101.)  He blacked out, and suffered a laceration to his head.  (Tr. 1123-1126.)

***Hearing Testimony***

At the March 30, 2012 hearing, Elliott testified to the following:

- He owned a liquor store for eight years where he opened and closed the store, served customers, ran the register, and stocked shelves.  (Tr. 47.)  He then sold the store to Giant Eagle but continued to work there as a manager.  He had the same job duties, but the lifting "increased tenfold." (Tr. 48.)  He worked full-time at Target for a few months in 2007, managing the new grocery department.  (Tr. 48-49.)  He also worked two separate four- month temp jobs as a cleaner at a nuclear power plant in 2007 and 2009.  (Tr. 45-46.)  Between those jobs, he worked part-time as a cashier at WalMart.  (Tr. 46.)

---

[4]

Syncope, commonly referred to as fainting, is defined as a temporary loss of consciousness due to a shortage of oxygen to the brain. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1807 (30th ed., 2003)

- He does not feel that he could work because at best he would be inconsistent. (Tr. 33.)  He does not sleep well and would likely "call off quite frequently."  He has arthritis in "many body parts" that prevents him from walking, kneeling or lifting from a squat position. (Tr. 34.)  He has difficulty lifting and twisting due to back pain.  He has neck pain that prevents him from looking down, up, left, or right.  He also has "a lot of arthritis in his hands" resulting in soreness, stiffness, and a lack of dexterity.  He has trouble bending from his waist and knees.  (Tr. 34-37.)

- He can stand for 20 minutes before needing to sit and rest for 10 to 15 minutes. (Tr. 35-36.)  Pain in his knees prevents him from walking longer than 20 minutes at a time.  He can sit for 10 to 15 minutes until he "stiffen[s] up" and needs to stand again.  (Tr. 36.)  He can lift and carry five to ten pounds on "a repetitive basis."  (Tr. 37.)

- Pain in his feet prevents him from standing for a long period of time.  (Tr. 36.)  He believes his foot pain was caused by "bunions, arthritis, [and] years and years of walking on concrete."  (Tr. 38.)  He also developed a hematoma on his right foot in 2011.  It flared up when he did a lot of walking during a vacation to New York with his family.  (Tr. 54.)  His doctor put him "in a boot" and that resulted in a problem with his left foot.  He now experiences arthritis in his feet.  (Tr. 37.)

- He cannot keep his arms up for very long because his shoulder aches.  He can hold his arms over his head for a minute before experiencing pain in his shoulder and neck.  He has similar problems reaching to the right or left side with his arms up.  (Tr. 38-39.)

- Because of his heart issues, he does not have "very much stamina." (Tr. 40.)  His doctor told him that some of the damage to his heart is irreversible.  His medications cause him to feel drowsy and sluggish.  (Tr. 40-41.)  His doctor reduced two of his medications, and took him off another to address this issue.  However, he still experiences fatigue.  (Tr. 53.)

- He has good days and bad days.  He experiences bad days approximately four times per week where he is in pain "in more than one area."  (Tr. 42.)  When he is having a bad day, he is confined to his bed or a couch.  (Tr. 43.)

- His doctors have suggested stretching exercises.  Previously, he had "got[ten] to where he was pretty good on the treadmill but that's when [his] feet started to flare up and his knees." (Tr. 51.)  His doctors told him not to use the treadmill anymore "because of the pounding."  (Tr. 52.)  His cardiologist has told him that he looks "extremely fit," has been doing "extremely well in general," and is leading a "pretty normal life."  (Tr. 52-53.)  He did experience some shortness of breath, however, when he recently tried to "cut up a tree."  (Tr. 53.)

-10-

The VE testified Elliott had past relevant work as a cleaner (medium, VSP 3); retail store manager (performed as medium, SVP 7); and stock clerk (heavy, SVP 4). (Tr. 59-60.) The ALJ then posed the following hypothetical question:

> Assume an individual of the claimant's age, education, and work experience who is limited to the full range of light exertional work as defined in the regulations. Limited to frequent climbing of ramps and stairs, occasional climbing of ladders, ropes, and scaffolds, frequent stooping, kneeling, crouching, and crawling. Individual must avoid moderate exposure to hazards such as operational control of moving machinery and unprotected heights, and that's it. Could such an individual return to any of the past work he testified to?

(Tr. 60.)

The VE testified such a person would be capable of Elliott's past relevant work as a retail store manager as described in the Dictionary of Occupational Titles ("DOT"), rather than as described by Elliot. (Tr. 60.) In addition, the VE testified such a person could perform the work of a cashier II; fast food worker; or cleaner/housekeeper. (Tr. 61.) The VE also testified that "some of the skills associated with [Elliott's past work in] retail store management would be transferable to other light management types of positions." (Tr. 61.) However, he testified these skills are not typically transferable to sedentary management positions. (Tr. 62.)

The ALJ then posed a second hypothetical, adding the limitation that the person could only stand and walk for a total of four hours per day. (Tr. 62.) The VE testified such a person would not be able to perform Elliott's past work. (Tr. 62.) The ALJ then asked whether the individual would be able to perform the other jobs identified in response to the first hypothetical; i.e., the cashier II, fast food worker, and cleaner/housekeeper jobs. (Tr. 62.) The VE testified that "there would be a percentage . . . of the cashier II job that would remain for that 25 percent where you could alternate between sitting and standing at those levels, but the other jobs would

-11-

not exist." (Tr. 63.) However, he testified the individual could perform the job of information clerk. (Tr. 63.)

Elliott's attorney then posed a hypothetical that was the same as the first, but added limitations in the individual's ability to turn his head up, down, and side to side, including not being able to turn his neck as much as 30% of the day. (Tr. 63-64.) The VE testified that "as a general rule that kind of limitation is often more limiting for someone attempting sedentary work, because when one is doing light work, or medium work or heavy work and you're on your feet the majority of the time, you can move your feet to turn your head. But, . . . it would be more difficult. But I don't know that I could say that those jobs would all be ruled out by a limitation on turning the head or looking up and down 30% of the day." (Tr. 64.) Finally, also in response to a question from Elliott's attorney, the VE testified that the jobs he had identified would not allow an absenteeism rate greater than 1.5 days per month. (Tr. 64-65.)

### III. Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[5]

---

[5] The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work

-12-

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and, (3) he filed while he was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Elliott was insured on his alleged disability onset date, August 1, 2009 and remained insured through the date of the ALJ's decision.  (Tr. 11.)  Therefore, in order to be entitled to POD and DIB, Elliott must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.  Summary of Commissioner's Decision

The ALJ found Elliott established medically determinable, severe impairments, due to cardiomyopathy, now well compensated; history of congestive heart failure with left ventricle dysfunction; atrial fibrillation status post implantation of implantable cardioverter defibrillator ("ICD"); degenerative disc disease of the lumbar spine; and, cervical spondylosis.  (Tr. 13.)  However, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  (Tr. 14.)  Elliott was found capable of performing his past work activities and was determined to have a Residual Functional Capacity ("RFC") for a limited range of light work.  (Tr. 14-19.)  The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Elliott was not disabled. (Tr. 18-

experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled.  For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

19.)

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

-14-

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  Analysis

### Step Two Analysis of Bilateral Foot Pain and Arthritis

Elliott first argues the ALJ erred in failing to find his bilateral foot pain and arthritis to be severe impairments at step two. He maintains these impairments qualify as "severe" in light of the fact he sought treatment for them over a long period of time; and, they have been repeatedly

-15-

documented as interfering with his ability to perform basic work activities.  Elliott maintains that, although it is often harmless error to mistakenly categorize an impairment as non-severe at step two, that is only the case when that impairment is properly considered later in the decision.  Here, Elliott argues, "[t]here is no evidence anywhere in the ALJ's decision that reflects consideration of these limitations; they were not discussed when the ALJ found the causal impairments nonsevere; nor were they included in his analysis of the case and his explanation of his reasoning."  (Doc. No. 19 at 8.)

The Commissioner cites the ALJ's reliance on objective medical evidence demonstrating the bilateral foot pain and arthritis did not impact Elliot's ability to work, including treatment notes indicating full range of motion in both of his feet without pain.  The Commissioner also argues Elliott's ability to jog, walk, and bike are consistent with the ALJ's decision to classify the impairments as non-severe.  Finally, the Commissioner asserts that, even if the ALJ erred in classifying these impairments as non-severe, any such error would be harmless as the ALJ fully considered Elliott's bilateral foot pain and arthritis in assessing his RFC.  (Doc. No. 20 at 9-11.)

At step two of the disability analysis, the ALJ must determine whether the claimant has a severe impairment.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).  To determine if a claimant has a severe impairment, the ALJ must find that an impairment, or combination of impairments, significantly limits the claimant's physical or mental ability to do "basic work activities."  *See* 20 C.F.R. § 404.1520(c).  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," and include: (1) physical functions; (2) the capacity to see, hear and speak; (3) "[u]nderstanding, carrying out, and remembering simple instructions; (4) [u]se of judgment; (5) [r]esponding appropriately to supervision, co-workers, and usual work situations; and, (6)

[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b).

The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle," *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n. 2 (6th Cir. 2007), intended to "screen out totally groundless claims." *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985). *See also Anthony v. Astrue*, 2008 WL 508008 at * 5 (6th Cir. Feb. 22, 2008). Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe." SSR 96–3p, 1996 WL 374181 at *1. After the ALJ makes a finding of severity as to even one impairment, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96–8p, 1996 WL 374184, at *5. When the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the ALJ's failure to find additional severe impairments at step two does "not constitute reversible error." *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec.*, 2009 WL 4981686 at * 2 (6th Cir. 2009); *Anthony v. Astrue*, 2008 WL 508008 at * 5 (6th Cir. Feb. 22, 2008).

Here, at step two, the ALJ concluded Elliott's cardiomyopathy; history of congestive heart failure with left ventricular dysfunction; atrial fibrillation status post implantation of ICD; degenerative disc disease of the lumbar spine; and, cervical spondylosis constituted "severe" impairments. (Tr. 13.) He then found Elliott's bilateral foot pain and arthritis were not "severe," explaining as follows:

> The claimant's bilateral foot pain and arthritis are non-severe impairments since they have no more than a minimal effect on the claimant's capacity to perform basic work activities. On August 11, 2011, an x-ray of claimant's right foot showed mild first MTP arthritic changes with mild hallux valgus deformity. (EX

-17-

29F, pg 8). A CT scan of the claimant's right foot on August 18, 2011 was unremarkable except for a soft tissue hematoma. (EX 31F, pg 1). On December 7, 2011, the claimant followed up with his treating podiatrist, Catherine Ferguson, DPM. Dr. Ferguson noted that the claimant was immobilized in a CAM walker for his left Achilles tendinitis, but threw it in the garage because he "hated the thing." (EX 34F, pg 2). Dr. Ferguson examined the claimant's feet and found that he had full ranges of motion without pain or crepitus at the ankle joint, subtalar joint, midtarsal joint, and first metatarsophangeal joint bilaterally. Dr. Ferguson also reviewed the claimant's left foot films and noted that his soft tissue integrity was maintained with no acute bony pathology and no significant spurring. *Id.* Dr. Ferguson diagnosed the claimant with bilateral plantar fasciitis and Achilles tendinitis and recommend[ed] conservative treatment to include stretching, icing, and NSAID therapy. (EX 34F, pg 3). With respect to claimant's arthritis, on June 14, 2011, the claimant had bilateral knee x-rays that showed only minimal arthritic changes. (EX 29F, pg 9).

(Tr. 13-14.)

The Court finds substantial evidence supports the ALJ's conclusion that Elliott's bilateral foot pain and arthritis are non-severe. With regard to Elliott's foot pain, the record reflects no treatment for this condition in 2009 and only one isolated complaint in March 2010, when he indicated to Dr. Gutjahr that his feet felt "achy." (Tr. 276.) Elliott fails to direct this Court's attention to any evidence indicating he received further treatment or care for foot pain until August 2011, when the hematoma was found. (Tr. 1058.) However, Dr. Ferguson's treatment notes indicate this issue was primarily resolved by November 2011 with Elliott indicating he no longer needed the CAM walker. (Tr. 1056, 1057.) Elliott did go on to complain of left heel pain in December 2011, but x-rays showed no acute bony pathology; "no significant spurring. . . despite pt report that he has heel spurs;" and, well-maintained soft tissue integrity. (Tr. 1070.) While Dr. Ferguson diagnosed plantar fasciitis and Achilles tendinitis at that time, the record reflects she recommended only stretching, icing, and NSAID therapy. (Tr. 1071.) Elliott does not identify any medical opinion evidence indicating his bilateral foot pain is "severe" or results

-18-

in physical limitations.[6] Thus, the Court finds substantial evidence supports the ALJ's step two determination that Elliott's foot pain was "non-severe."

The Court reaches a similar conclusion with regard to Elliott's arthritis. As an initial matter, the Court notes the ALJ appears to have limited his finding that Elliott's arthritis was "non-severe" to Elliott's knee pain.[7] As noted above, Elliott complained of bilateral knee pain in June 2011, at which time X-rays were taken that showed only "minimal arthritic changes." (Tr. 1045, 1049.) Elliott does not direct this Court's attention to any other evidence indicating he subsequently complained of or received treatment for knee pain. Accordingly, the Court finds the ALJ did not err in determining Elliott's knee pain did not constitute a severe impairment.

Moreover, the Court finds that, even if the ALJ did err in finding Elliott's bilateral foot and knee pain non-severe at step two, the ALJ's consideration of the cumulative effect of Elliott's impairments (both severe and non-severe) throughout the remaining steps of the analysis rendered any such error harmless. *Maziarz*, 837 F.2d at 244. The record reflects the ALJ questioned Elliott about his foot pain during the March 30, 2012 hearing. (Tr. 36-38, 54.) At step four, he expressly acknowledged Elliott's complaints of foot pain and indicated he

---

[6] Dr. Sailors did complete a Medical Assessment of Ability to do Work-Related Activities (Physical) on November 11, 2011, in which he opined Elliott was able to stand/walk 2 to 3 total hours per day (one hour without interruption); and, sit for 7 to 8 total hours per day (one to two hours without interruption). (Tr. 1092.) However, Dr. Sailors failed to specify any medical findings or diagnoses that supported this assessment, despite the fact the form asked him to do just that. (Tr. 1092.) Given that Elliott also received treatment from Dr. Sailors for back and neck pain, it is not apparent whether Dr. Sailors believed these limitations resulted from Elliott's foot pain.

[7] The ALJ found Elliott's degenerative disc disease and cervical spondylosis to be "severe" impairments at step two, and went on to discuss his back, neck and hip pain at length in formulating the RFC at step four. (Tr. 16.)

"considered **all symptoms** and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  (Tr. 14, 15.) (emphasis added).  The ALJ also noted that he "carefully reviewed and analyzed all the evidence of record and hearing testimony, whether or not it is specifically cited in the decision."  (Tr. 15.)  That the ALJ did, in fact, consider Elliott's foot and knee pain in formulating the RFC is further borne out at several points in his step four analysis by his discussion of Elliott's exertional activities, which included extensive walking while on vacation, bicycling up to ten miles at a time, and jogging on the treadmill.  (Tr. 15-18.)  All these activities would  necessarily incorporate the use of Elliott's feet and knees.  Accordingly, the Court finds Elliott's argument that the ALJ failed to consider his bilateral foot and knee impairments at later steps in the decision to be without merit.


### *RFC Assessment*

Elliott argues the RFC is not supported by substantial evidence because it fails to adequately account for his fatigue, shortness of breath, and lack of stamina.  He maintains, while it is true he has "demonstrated an ability to engage in some physical activity, such as jogging on a treadmill, it is not necessarily true that he engages in such activity without difficulty, or even that is safe for him to do so."  (Doc. No. 19 at 9.)  Elliott asserts his capacity for physical activity is "nowhere near as full as the ALJ alleges," and that "when he crosses the line into the kind of activity the ALJ considers him capable of performing, he suffers serious consequences."  *Id*.  He maintains the ALJ cherry-picked the evidence and failed to acknowledge contrary evidence in the record indicating that his conditions are ongoing, not well-controlled, and "dangerously lurking in the background."  *Id*. at 11.

The Commissioner maintains the ALJ thoroughly considered the objective medical evidence, including evidence demonstrating Elliott's cardiac condition significantly improved following his ICD implantation.   The Commissioner also emphasizes Dr. Wiseman's repeated findings that Elliott appeared "very fit" and was doing "extremely well."   In addition, she argues the RFC is supported by Elliott's engagement in significant exertional activities including jogging, biking up to ten miles, walking on his treadmill, lifting weights, and extensive walking while on vacation.  (Doc. No. 20 at 11-13.)

A claimant's RFC is the most that he can still do despite his functional limitations.  20 C.F.R. § 404.154(a); SSR 96-8p.  The assessment must be based upon all of the relevant evidence, including the medical records and medical source opinions.  20 C.F.R. § 404.1546(c).  The final responsibility for deciding the RFC "is reserved to the Commissioner."  20 C.F.R. § 404.1527(e)(2).  While this Court reviews the entire administrative record, it "does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)).  *See also Vance v. Comm'r of Soc. Sec.*, 2008 WL 162942 at * 6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is not the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.")  Indeed, the Sixth Circuit has repeatedly upheld ALJ decisions where medical opinion testimony was rejected and the RFC was determined based upon objective medical and non-medical evidence.  *See e.g., Ford v. Comm'r of Soc. Sec.*, 2004 WL 2567650 (6th Cir. Nov. 10, 2004); *Poe v. Comm'r of Soc. Sec.*, 2009 WL 2514058 (6th Cir. Aug. 18, 2009).  "[A]n ALJ

does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe*, 2009 WL 2514058 at * 7.

Here, the ALJ thoroughly discussed the medical evidence regarding Elliott's cardiovascular and musculoskeletal impairments. (Tr. 13-17.) He noted that, after Elliott's uneventful IDC implantation procedure, Dr. Wiseman's treatment notes demonstrated "rapid and substantial medical improvement," including Elliott's ability to ride up to ten miles on a bicycle and jog "without difficulty" on the treadmill. (Tr. 16.) The ALJ particularly noted a recent echocardiogram showing normal left ventricular function with no significant valvular disease and Dr. Wiseman's assertion that he was reasonably optimistic for Elliott's recovery. *Id.* The ALJ also noted Dr. Wiseman discontinued Elliott's Amiodarone medication in order to alleviate his fatigue. *Id.*

Regarding Elliott's musculoskeletal impairments, the ALJ noted that while an MRI of Elliott's lumbar spine in 2006 revealed multilevel small disc herniation, an x-ray of Elliott's hips in 2010 was normal, and a CT scan of his spine in 2010 did not reveal any cord compression and only slight narrowing of the neural foramina. (Tr. 16.) The ALJ also referred to Dr. Zayat's unremarkable physical and neurological examinations in concluding that his RFC limitation of light work with postural limitations "more than accounts for the claimant's back and neck pain." *Id*.

Finally, the ALJ emphasized Elliott's "high functioning activities of daily living," noting that "[d]espite the claimant's allegations of debilitating pain and fatigue, the claimant exercises by walking extensively, bicycle riding up to ten miles, and jogging on the treadmill." (Tr. 17.)

-22-

He remarked that "the claimant's description of the severity of fatigue and pain has been so extreme as to appear implausible especially when compared to Dr. Wiseman's indication that the claimant has been doing extremely well and leads a pretty normal life." ( Tr. 17.)

The ALJ formulated Elliott's RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant's work is limited to lifting up to 20 pounds occasionally; lifting/carrying up to 10 pounds frequently; standing/walking for about 6 hours and sitting up to 6 hours in an 8 hour work day with normal breaks; frequent climbing of ramps or stairs; occasional climbing of ladders, ropes, or scaffolds; frequent stooping, kneeling, crouching, and crawling; and avoiding moderate exposure to operational control of moving machinery and unprotected heights.

(Tr. 14)

The Court finds the RFC is supported by substantial evidence.  Contrary to Elliott's argument, the ALJ fully and repeatedly acknowledged Elliott's complaints of pain and fatigue. However, the ALJ discounted Elliott's description of the severity of these symptoms in light of (1) objective medical evidence showing significant improvement, normal left ventricular function, normal sinus rhythm, and no significant valvular disease; (2) Dr. Wiseman's assessment that Elliott was doing extremely well and leading a "pretty normal life;" and, (3) Elliott's extensive walking, bicycling, and jogging.  Additionally, and as the ALJ noted, the RFC is supported by the assessment of state agency physician Jerry McCloud, M.D., who opined Elliott was capable of lifting and carrying 20 pounds occasionally and 10 pounds frequently; standing and/or walking for 6 hours and sitting for 6 hours in an eight hour workday;  frequently climbing ramps and stairs, stooping, kneeling, and crouching; and, occasionally climbing

ladders, ropes, and scaffolds.  (Tr. 80-81.)  This opinion was later affirmed by state agency

physician Leon D. Hughes, M.D.[8]  (Tr. 91-93.)

Although Elliott cites evidence from the record that he believes supports a more

restrictive RFC,  the findings of the ALJ "are not subject to reversal merely because there exists

in the record substantial evidence to support a different conclusion."  *Buxton,* 246 F.3d at 772-

73.  Indeed, the Sixth Circuit has made clear that an ALJ's decision "cannot be overturned if

substantial evidence supports the claimant's position, so long as substantial evidence also

supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477

(6th Cir. 2003).  In the instant case, the ALJ clearly articulated his reasons for finding Elliott

capable of performing work as set forth in the RFC and these reasons are supported by

substantial evidence.  Accordingly, Elliott's argument that the ALJ erred in formulating the RFC

is without merit.

### Credibility Assessment

Finally, Elliott argues, summarily, that "the ALJ's errors remove the basis of his finding

that Elliott is not fully credible."  (Doc. No. 19 at 12.)  The Commissioner argues the ALJ's

credibility analysis is supported by substantial evidence, citing in particular evidence regarding

Elliott's significant exertional activities.  (Doc. No. 20 at 13-14.)

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.

*See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).  The ALJ's

---

[8]  Elliott notes that Dr. Sailors "has repeatedly stated that [he] should not be working, both for
his safety and for the safety of others." (Doc. No. 19 at 9.)  The ALJ acknowledged Dr. Sailors'
November 11, 2011 opinion, but assigned it little weight on the grounds it was not supported
by the objective medical evidence and contradicted Elliott's activities of daily living.  Notably,
Elliott does not argue the ALJ assigned improper weight to Dr. Sailors' opinion.

-24-

credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight."  SSR 96–7p, Purpose section; *see also Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so"); *Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 733 (N.D. Ohio 2005).

To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* SSR 96–7p, Purpose.  Beyond medical evidence, there are seven factors that the ALJ should consider.[9]  The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence.  *See Cross*, 373 F.Supp.2d at 733; *Masch v. Barnhart*, 406 F.Supp.2d 1038, 1046 (E.D.Wis.2005).

Here, the ALJ found Elliott's complaints of disabling pain and fatigue were inconsistent with the objective medical evidence, and Elliott's abilities to walk, jog, and bicycle.  The

---

[9]  The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96–7p, Introduction; *see also Cross*, 373 F.Supp.2d at 732.

decision also contrasted statements made by Elliott during the hearing indicating he no longer uses the treadmill, with Dr. Wiseman's treatment notes indicating Elliott was jogging and walking on the treadmill as recently as February 2011. (Tr. 17.)

The Court finds the ALJ did not improperly assess Elliott's credibility. While Elliott argues the ALJ failed to properly credit evidence regarding his fatigue and lack of stamina, it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)). The ALJ provided sufficient reasons for his credibility determination supported by reference to specific evidence in the record.

Elliott's third assignment of error is, therefore, without merit.

## VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence. Accordingly, the decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.


/s/ Greg White
U.S. Magistrate Judge

Date: June 11, 2014